

# NUMBER 13-21-00421-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ADAM CLAYTON TUCKER,                                     **Appellant,**

**v.**

THE STATE OF TEXAS,                                         **Appellee.**

## On appeal from the 377th District Court
## of Victoria County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva
Memorandum Opinion by Justice Silva**

A jury convicted appellant Adam Clayton Tucker of one count of intoxication manslaughter, a second-degree felony enhanced to a first-degree felony.[1] *See* TEX.

---

[1] The jury found that Tucker was previously convicted of involuntary manslaughter and indecency with a child, both felonies other than state jail felonies. *See* TEX. PENAL CODE ANN. § 12.42(b).

PENAL CODE ANN. § 49.08. The jury assessed Tucker's punishment at ninety-nine years' imprisonment. In his sole issue, Tucker challenges the sufficiency of the evidence to support the conviction. We affirm.

## I.   BACKGROUND

On or about November 6, 2018, at approximately 9:15 p.m., a single-vehicle motorcycle collision resulted in the death of 23-year-old Kelsey Benedict and hospitalization of Tucker. Tucker was subsequently indicted for causing Benedict's death. At trial, he disputed that he was intoxicated, that he was driving the motorcycle at the time of the accident, and that his actions were the "but for" cause of Benedict's death. *See id.*

Although there were no witnesses to the accident, two bystanders attempted to provide aid that evening and testified at Tucker's trial: Nathan Blaine Burow and Gilbert Garcia. Burow testified he was on his way home when he saw a man, later identified as Tucker, "sitting down" on the side of the road, "waving for [him] to stop." Burow testified that after initially tending to Tucker, he returned to his vehicle to retrieve a flashlight. It was then that Burow stumbled upon a saddle bag, which he picked up and threw toward the motorcycle, noticing for the first time a woman, Benedict, underneath the motorcycle.

Garcia stopped to assist shortly after Burow. Garcia testified that Tucker was "crying in pain, yelling," and Garcia could smell alcohol on Tucker's breath. Benedict was "pinned underneath the motorcycle" about six to ten feet away from Tucker. Garcia testified that he checked Benedict's vitals but found no pulse and called 911.[2] When

---

[2] Ted Thompson, 911 center communications manager for the City of Victoria, confirmed the city received a call concerning the accident at approximately 9:41 p.m.

asked about the road conditions that evening, Garcia stated there had been no precipitation, there was no debris in the roadway, and the road was a "straight-ahead road."

Medical records admitted at trial indicated that Emergency Medical Services (EMS) personnel arrived at the crash site at 9:48 p.m. and notated Tucker's breath smelled of alcohol. Tucker reportedly told EMS personnel that he did not know the involved female. Tucker was transported to DeTar Hospital, where nursing notes with a time stamp of 11:26 p.m. also stated Tucker "smells of alcohol." Tucker was described as conscious and uncooperative, and he reportedly told hospital staff that the "other person involved in [the] accident was [an] on and off girlfriend . . . but he could not recall her name."

Texas Department of Public Safety (DPS) Trooper Oscar Garcia Jr. arrived at the hospital at 11:29 p.m. Trooper Garcia recalled smelling "the strong odor of alcohol in the room itself" and emitting from Tucker's breath and body. Trooper Garcia testified that Tucker had "thick, tongue-tied, slurred speech, [and] glassy, red, bloodshot eyes," and Tucker was unable to answer questions about what had happened or how the accident was caused. Trooper Garcia surmised that Tucker "was intoxicated by not having the normal use of his physical faculties" and requested that Tucker consent to a blood draw. Tucker consented, and a blood sample was taken at 11:55 p.m. On cross-examination, Trooper Garcia conceded that he had used an expired kit to collect the blood sample.

Renee Hawkins, lead forensic scientist for the DPS toxicology crime laboratory in Austin, testified that the expiration dates on blood collection kits concern the vacuum capacity of the tube used to collect the blood sample:

3

That means that the vacuum that is inside a blood tube that is used to collect the sample from a person's vein could start to be—to deplete. . . . That would mean that instead of collecting the exact volume that the tube is designed to collect, that it might start to collect less of that volume or be capable of collecting less of that volume or it may not work at all.

Hawkins opined that the use of expired tubes in this instance did not compromise the integrity of the samples collected. Hawkins explained that the tube used here was designed to hold ten milliliters, there were six milliliters of Tucker's blood in the tube, and only two milliliters were needed to "complete all the testing."

Tucker's laboratory results indicated that he had a .069 BAC level and was positive for oxycodone. Hawkins testified that, much like alcohol, oxycodone acts as a depressant with sedative effects:

[I]t can affect you in a way that could create dizziness, drowsiness, fatigue. It can cause you to slow your reactions or increase your reaction time. And it can also have effects on your muscular coordination, as well as your balance and speech, vision. And it can affect your ability to concentrate on more than one thing at a time.

Hawkins additionally testified to the absorption and elimination rate of oxycodone and alcohol. Hawkins explained that alcohol impairment may begin "as soon as you start to drink it, and your blood alcohol concentration starts to rise," and the elimination rate for a majority of the population is ".01 to .03 grams of alcohol per 100 milliliters per hour." Hawkins testified that although the legal limit is .08, a "majority of studies with driving show that .05 grams per 100 milliliters a person does not have the normal mental and physical faculties."

DPS Trooper Matthew Cornett, one of several officers on scene that evening, testified that he arrived after Tucker had already been transported to the hospital. Trooper

4

Cornett located a "saddle bag" containing "cans of Bud Light, unopened, cold to the touch" in close proximity to the motorcycle. Trooper Cornett additionally noted that the motorcycle's "speedometer was locked at approximately 42 miles an hour," indicating the speed the motorcycle was traveling at the time it impacted the bar ditch.[3] Trooper Cornett observed "no skids or brake marks" and nothing to demonstrate "jerking or aggressive[]" maneuvering before the vehicle left the roadway. Rather, Trooper Cornett testified, "[t]he tire marks in the grass show a gradual movement off the roadway." Trooper Cornett acknowledged on cross-examination that the air pressure in the motorcycle tires had been below manufacturer recommendations at the time of the accident. Trooper Cornett nonetheless identified Tucker's intoxication as the cause of the accident.

In a statement to law enforcement two weeks following the accident, Tucker told officers he left work between 5 and 6 p.m. and went to a strip club in Corpus Christi, where Benedict was employed and where Tucker drank "numerous beers." Tucker invited Benedict to go back to Victoria with him so she could "ride his motorcycle." Tucker maintained his intentions with Benedict had been strictly platonic. En route to Victoria, they stopped at a gas station in Refugio to purchase more alcohol. Tucker said that he consumed a single oxycodone pill at some unspecified point between Corpus Christi and Victoria. Tucker and Benedict engaged in sexual relations after arriving at Tucker's residence in Victoria. Afterward, Tucker allowed Benedict to drive his motorcycle to a nearby store. According to Tucker, Benedict was driving when the accident occurred

---

[3] The posted speed limit was 60 miles per hour.

about eight minutes away from his residence. Tucker was unable to name anyone else that he had ever let drive his motorcycle before.

Tucker's daughter, Casey Tucker, and ex-wife, Christi Ann LeBeuf, described Tucker as an experienced rider, and neither could recall an instance where Tucker had allowed anyone else to drive his motorcycle. In November of 2018, Casey lived in an adjoining residence located on the same property as her parents' home. Although Casey did not see her father the evening of the fatal collision, she recalled hearing his motorcycle start up around 9 p.m. Casey and Christi visited Tucker in the hospital in the early hours of November 7, 2018, and each testified they could smell the odor of an alcoholic beverage on him. Christi described the odor as "strong" and indicated it could be smelled "on his breath."

Marleana Ayala, Benedict's mother, testified that she was close with her daughter and had spoken to her earlier on the day she passed. Ayala stated that while her daughter enjoyed riding on the back of motorcycles, Benedict had never driven one.

Dawn Euton, co-owner of Victoria Harley-Davidson and the involved motorcycle's previous owner, testified that the motorcycle had been customized, and the additions resulted in a motorcycle that was too powerful for a beginner rider to operate. Euton further testified that she had been in a bike club with Tucker and his then-wife Christi; Tucker was a skilled driver; and Euton had never known Tucker to allow anyone else to drive his motorcycle. At some unspecified point after the accident, Euton confronted Tucker, and he confessed to driving his motorcycle at the time of the accident:

> Well, I remember—sometimes I—I'm turning into a mom, and I told him—I told him how disappointed I was that he hurt Christi so much. And then I

6

asked him—I just asked him point blank, you know, ["]Were you driving that bike? You let somebody else drive it?["] And he looked at me funny; and he said, ["]No, I drive my bike. Nobody else rides my bike. And["]—which is true. So I said, ["]Okay.["]

A jury found Tucker guilty and assessed punishment. This appeal followed.

## II.    DISCUSSION

### A.    Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence to support a conviction, "we consider the evidence in the light most favorable to the verdict" and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (adopting the standard of review for a sufficiency challenge as set out by *Jackson*). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Edward*, 635 S.W.3d at 655; *see Garcia v. State*, No. PD-0679-21, 2023 WL 151989, at *4 (Tex. Crim. App. Jan. 11, 2023) ("If the record supports conflicting inferences, the reviewing court must presume that the factfinder resolved the conflicts in favor of the prosecution and defer to the jury's factual determinations.") (cleaned up). We remain mindful that "[c]ircumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Delagarza v. State*, 635 S.W.3d 716, 723 (Tex. App.—Corpus Christi–Edinburg 2021, pet. ref'd) (citing *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018)). We measure

the sufficiency of the evidence by comparing the evidence produced at trial against "the essential elements of the offense as defined by the hypothetically correct jury charge." *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

To establish intoxication manslaughter under a hypothetically correct jury charge, the State was required to prove here that (1) Tucker (2) operated a motor vehicle in a public place (3) while intoxicated, and (4) by reason of that intoxication, (5) he caused the death of another by accident or mistake. *See* TEX. PENAL CODE ANN. § 49.08; *Matamoros v. State*, 500 S.W.3d 58, 62 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.). In other words, the State was required to prove that Tucker's intoxication caused the fatal result, and not just his operation of his motorcycle. *See Hanna v. State*, 426 S.W.3d 87, 98 n.57 (Tex. Crim. App. 2014) ("[I]ntoxication manslaughter require[s] proof that it was the intoxicated driving that caused the victim's injuries."); *Matamoros*, 500 S.W.3d at 65.

The penal code defines "intoxication" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." TEX. PENAL CODE ANN. § 49.01(2)(A). As for causation, the penal code provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." *Id.* § 6.04(a).

8

**B.    Operation Analysis**

Tucker first argues that the evidence at trial fails to establish that he—as opposed to Benedict—was operating the motorcycle at the time of the accident. We disagree.

Although there were no witnesses at the time of the accident and Tucker denied operating the motorcycle, the jury was free to determine what, if any, weight to give to Tucker's statements to law enforcement and medical personnel. *See Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) ("The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimonies, and the reviewing court must not usurp this role by substituting its own judgment for that of the jury."). In performing its credibility determination, the jury could have considered Tucker's inconsistent statements regarding whether he knew Benedict; Tucker's concession that he drove the motorcycle at all other points in the evening; and Tucker's admission to Euton that he was driving—not Benedict. *See id.*; *see also Gandee v. State*, No. 13-18-00343-CR, 2019 WL 5609703, at *3 (Tex. App.—Corpus Christi–Edinburg Oct. 31, 2019, no pet.) (mem. op., not designated for publication) ("[O]ur standard of review requires that we resolve any conflicts or inconsistencies in the evidence in favor of the verdict."). Other evidence also supported the inference that Tucker had been driving: Euton, Casey, and Christi testified that Tucker had never let anyone drive his motorcycle, and Tucker was unable to provide the name of a single individual he had previously allowed to drive his motorcycle. *See Delagarza*, 635 S.W.3d at 723.

Given our standard of review and considering the evidence presented during trial as well as the reasonable inferences that the jury was free to make from that evidence,

9

we conclude that the evidence is sufficient to establish that Tucker was operating the motorcycle at the time of the accident. *See Edward*, 635 S.W.3d at 655; *Curlee*, 620 S.W.3d at 778.

## C. Intoxication Analysis

Tucker next avers that the State failed to prove he was intoxicated at the time the accident occurred. However, a rational factfinder could have found beyond a reasonable doubt that Tucker was intoxicated at the time of the accident based on the following evidence: Tucker admitted to having consumed multiple beverages in the hours leading up to the accident and to taking oxycodone while enroute to Victoria, approximately one hour before the accident. *See Zavala v. State*, 89 S.W.3d 134, 140 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (concluding that, though the precise time the accident occurred was unknown, evidence that appellant had been drinking several hours prior could be used to establish intoxication at the time of the accident); *see also Gandee*, 2019 WL 5609703, at *3 (concluding that the jury could have relied on appellant's admission to law enforcement that he consumed alcohol prior to the accident as evidence of intoxication); *Salazar v. State*, No. 13-16-00645-CR, 2017 WL 6545991, at *7 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2017, pet. ref'd) (mem. op., not designated for publication) (same). The State presented evidence that both oxycodone and alcohol were found in Tucker's system three hours after the accident, and the State's expert witness, Hawkins, testified to the depressive effects and elimination rates associated with the substances. Hawkins further opined that Tucker's toxicology report supported the inference that he had lost the normal use of his mental and physical faculties. *See Burnett*

*v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017) ("The jury is permitted to consider whether a defendant was intoxicated from 'any other substance' when there is evidence that the defendant ingested a substance that caused him to become intoxicated or there is sufficient evidence for a rational juror to infer such."); *Fulton v. State*, 576 S.W.3d 905, 910 (Tex. App.—Tyler 2019, pet. ref'd) (concluding jury was entitled to believe expert's testimony concerning appellant's toxicology report and explanations of the intoxicating effects of alcohol consumption and its absorption and elimination rates); *see also Embry v. Martinez*, No. 05-20-00022-CV, 2021 WL 2309983, at *5 (Tex. App.—Dallas June 7, 2021, no pet.) (mem. op., not designated for publication) (same).

Moreover, several individuals testified to their observations regarding Tucker's intoxicated condition after the accident. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010) (noting that slurred speech and bloodshot eyes, among other things, "would logically raise an inference that the defendant was intoxicated"); *see also Garcia v. State*, No. 13-18-00373-CR, 2020 WL 1858285, at *3 (Tex. App.—Corpus Christi–Edinburg Apr. 9, 2020, pet. ref'd) (mem. op., not designated for publication) (providing that lay opinion testimony may be probative evidence of intoxication as "a witness does not have to be an expert to testify that a person he observes is intoxicated by alcohol"). A bystander at the scene testified that he smelled alcohol emanating from Tucker—an observation also expressed by the responding EMS medics minutes later, staff at the hospital, Trooper Garcia, and hours later, Tucker's daughter and ex-wife. *See Foley v. State*, 327 S.W.3d 907, 915–16 (Tex. App.—Corpus Christi–Edinburg 2010, pet. ref'd) (concluding evidence was sufficient to support intoxication element where evidence

included testimony that appellant's breath smelled strongly of alcohol). Trooper Garcia described additional characteristics which, based on Trooper Garcia's training and experience, may also evidence Tucker's state of intoxication: thick, tongue-tied, slurred speech; and glassy, red, bloodshot eyes. *See Kirsch*, 306 S.W.3d at 745; *Kinnett v. State*, 623 S.W.3d 876, 899–900 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (providing that generally, an officer's opinion testimony based upon experience and the observed facts that a defendant was intoxicated is sufficient to establish the element of intoxication); *see also Garcia*, 2020 WL 1858285, at *3 (same).

Based on the aforementioned, we conclude that a rational factfinder could have found beyond a reasonable doubt that Tucker was intoxicated at the time of the accident. *See Edward*, 635 S.W.3d at 655; *Murray v. State*, 457 S.W.3d 446, 449 (Tex. Crim. App. 2015) ("Based on [the defendant's] admission that he had been drinking, [the officer's] observation that [the defendant] appeared 'very intoxicated,' and the fact that no alcoholic beverages were found in the vicinity, a factfinder could have reasonably inferred that [the defendant] consumed alcoholic beverages to the point of intoxication somewhere other than where he was found."); *Gibson v. State*, 233 S.W.3d 447, 451–52 (Tex. App.—Waco 2007, no pet.) (holding that the evidence was legally sufficient to establish that the defendant was intoxicated where his vehicle left the road and struck a tree; a sample of the defendant's blood revealed the recent ingestion of methamphetamine, cocaine, and two other drugs; forensic scientists testified how those drugs impaired motor skills and judgment; and circumstances of the accident itself were indicative of a loss of normal mental faculties).

**D.     Causation Analysis**

Finally, Tucker contends that the State failed to prove the requisite connection between his intoxication and the resulting harm, namely, Benedict's death. *See* TEX. PENAL CODE ANN. §§ 6.04(a), 49.08; *Hanna*, 426 S.W.3d at 98 n.57. However, "[t]he State is not required to prove that intoxication is the *sole* cause of the accident," *Matamoros*, 500 S.W.3d at 64, and we have already concluded that the evidence was sufficient to show that Tucker was operating the motorcycle while intoxicated at the time of the accident. *See* TEX. PENAL CODE ANN. § 49.08. "Being intoxicated at the scene of a traffic accident in which the actor was a driver is some circumstantial evidence that the actor's intoxication caused the accident, and the inference of causation is even stronger when the accident is a one-car collision with an inanimate object." *Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Thus, applying the necessary standard of review, we now conclude the jury could have reasonably found Tucker's intoxication caused Benedict's death, alone or concurrently with another cause, because Tucker was too impaired to operate his motorcycle on a public road, causing him to lose control of the motorcycle and collide into a bar ditch with Benedict as his passenger. *See id.*; *see also* TEX. PENAL CODE ANN. §§ 6.04(a), 49.08; *Matamoros*, 500 S.W.3d at 65 ("Based on the evidence set out above, a reasonable factfinder could have found beyond a reasonable doubt that 'but for' appellant's intoxication and operation of a motor vehicle on a public street, the death would not have occurred.").

We overrule Tucker's sole issue on appeal.

### III.    CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
9th day of March, 2023.